1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,              CASE NO. 15-cr-0430-GPC

11                            Plaintiff,    **ORDER DENYING DEFENDANT"S**
                                            **MOTION TO DISMISS COUNTS 1**
12        vs.                               **and 4 of INDICTMENT**

13                                          [ECF No. 25]
     TIMOTHY JOEL,
14
                             Defendant.
15

16

17                      **INTRODUCTION**

18        Defendant Timothy Joel is charged in a four-count indictment with obstruction

19   of justice, witness tampering, and false statement. On May 16, 2015, Joel filed a motion

20   to (1) strike surplusage from indictment, (2) dismiss portions of the indictment; and

21   (3) for additional discovery. (ECF No. 25.) The Government filed its response on May

22   22, 2015. (ECF No. 27.)  Joel filed a reply on May 28, 2015.  (ECF No. 28.) A hearing

23   was held on May 29, 2015, at which time the Court denied the motions to strike

24   surplusage from the indictment and for additional discovery but took the motion to

25   dismiss under submission. Based on the papers filed and the arguments of counsel, the

26   Court **DENIES** the motion to dismiss counts 1 and 4 the indictment.

27   ///

28   ///

# INDICTMENT

On February 19, 2015, the grand jury returned an Indictment charging Defendant with four felony counts: obstruction of justice, in violation of 18 U.S.C. § 1503 (Count 1); witness tampering, in violation of 18 U.S.C. § 1512(b)(2)(C) (Count 2); witness tampering, in violation of 18 U.S.C. § 1512(b)(2)(D) (Count 3); and making a false statement to a federal officer, in violation of 18 U.S.C. § 1001 (Count 4). Defendant Joel entered pleas of not guilty to all counts on February 2015.

# FACTUAL BACKGROUND

According to Government allegations, in 2007, Joel was a Special Agent assigned to an FBI squad in San Diego that investigated alien smuggling. In May 2007, Joel interviewed a Korean national (herein referred to by her initials "YK"), after she was apprehended at the Port of Entry attempting to enter the United States with false entry documents. Joel learned that YK was attempting to illegally enter the United States to work in the Los Angeles area as a prostitute. Defendant thereafter applied for "Significant Public Benefit Parole" for YK, a form of immigration status, claiming that she was a material witness in a criminal investigation. Defendant renewed YK's parole status in 2008, despite the fact that she was not actively working with the FBI. YK's parole status eventually expired in early 2009, and thereafter she had no legal right to remain in the United States. The Government alleges that Joel did not effect YK's departure from the United States, but instead began making dozens of payments to her through bank transfers, totaling over $20,000. Beginning in 2012, Defendant moved in with YK, living with her in an apartment in Los Angeles.

## A. FBI OPR Investigation

In July 2012, the FBI received information from a confidential source that Defendant was living with a suspected illegal alien, who worked as a "hostess" at a karaoke bar associated with prostitution. As a result, the FBI Office of Professional Responsibility ("OPR") opened an investigation, and flew Defendant to Washington,

DC for an interview held on October 2, 2012.[1] At the OPR interview, FBI investigative analysis consultants confronted Defendant about his relationship with YK. In response to questions, Defendant admitted that he paroled YK into the United States, when he worked on an FBI alien smuggling squad in San Diego. He denied providing her financial support or having any contact with her after he was transferred from San Diego to Washington, D.C. in 2009. Defendant explained that he had reconnected with YK earlier that year in Los Angeles when he was looking for an apartment. Defendant admitted that he moved into an apartment with YK on July 14, 2012, but claimed he only lived there for approximately two and a half months before moving out. After the interview, Defendant returned to Los Angeles, and FBI OPR referred the matter to the Department of Justice Office of Inspector General ("OIG") for a criminal investigation.

## B. DOJ OIG Investigation of Joel for Alien Harboring

On or about January 16, 2013, OIG agents Anthony Costakis and Thomas Reynolds interviewed Defendant Joel in Glendale, California. At the interview, Joel supplied agents with a letter which described his earlier interview with OPR. In the letter, Joel reiterated that (1) he paroled YK into the United States as a witness in 2007 when he was working in San Diego, (2) he recently reconnected with YK when he was searching for an apartment in Los Angeles, (3) he did not have any association with YK after he moved to Washington in 2009, and (4) he only lived with YK briefly, for a few months in 2012. The letter supplied to OIG agents was verified that it was "accurate to the best of my knowledge."

The Government alleges that following their interview of Joel, OIG agents investigated Defendant's claims, and discovered that many of them were false. First, Defendant's bank records showed that he made regular cash transfers to YK from 2009 through 2013, totaling more than $20,000. Second, Defendant's phone records showed

---

[1] According to Joel, he was informed that the investigation related to a routine Personal Security Interview and was never informed of the true nature of the interview. Also, Joel asserts that he had submitted a Bureau Personnel Management System address form indicating that his roommate was YK.

frequent telephone contact with YK over the past five years, including the entire year that Joel was in Washington, D.C. Finally, agents obtained the original parole documents for YK, submitted by Joel in 2007 and 2008. In those documents, Defendant described YK as a "leading material witness" in an alien smuggling investigation, when in fact FBI records do not contain any evidence that YK was opened as a source or provided any substantive information.

On February 26, 2013, SA Costakis called Joel to schedule an interview for February 28, 2013. On the next day, February 27, 2013, OIG agents traveled to YK's apartment to interview her. When agents knocked on her door at approximately 9:30 a.m., they were greeted by Joel at the door. The OIG agents interviewed YK, and asked Joel to return to the office for a follow-up interview the next day.

On February 28, 2013, Joel appeared before OIG investigators for a second interview, which was recorded and transcribed. When agents asked Joel about his presence at YK's apartment, he stated that he had only just moved in, and was planning on moving out in a few weeks. He admitted that he knew YK's immigration status was "probably not legal" because he had not "done any paperwork for her." He said he understood the agents' concerns about his continued living with YK, but explained that he got a "good vibe" after the January interview and thought everything had been resolved.

Over the next few months OIG agents continued to investigate Defendant and YK. Their investigation revealed that after the second interview, both YK and Defendant rented separate apartments, on the same floor of a new apartment building, at 349 South Lafayette Park, in Los Angeles. An interview with the manager from that apartment revealed that YK had broken her lease and moved out. Shortly thereafter, Defendant Joel broke his lease and moved out as well.

**C. OIG Attempts to Serve YK with a Subpoena**

On September 5, 2013, OIG arranged for a special agent with Homeland Security Investigations ("HSI") to place a recorded call to Defendant, in order to ascertain YK's

whereabouts in order to serve a federal grand jury subpoena. On the morning of the recorded call, agents in Los Angeles established surveillance near the Defendant's apartment building. In the call, Joel denied knowing YK's address and denied knowing her current phone number. Joel asked the HSI agent if this was "regarding OIG stuff?" The HSI agent replied that "I don't know what it's about. It's just a Grand Jury subpoena that I need to serve on her. It's a Homeland Security Investigations matter." Joel stated that he had previously learned that there was a grand jury subpoena for YK's testimony, but he instructed her to "please go back [to Korea] as soon as possible. Because the sooner you go back, the sooner this thing will all clear up for me." At the conclusion of the call, the agent warned Defendant not to contact YK and discuss the grand jury subpoena.

After the call was completed, agents observed Joel return to the building, at 11:12 a.m. He stayed for approximately one hour, and then returned to his FBI office downtown. A few hours later, agents observed YK exiting Defendant's building and entering the parking garage. Agents then served YK with a grand jury subpoena. Afterwards, YK sent a text message to Defendant, stating "I received the paper. I got caught. At the parking lot." Defendant later responded, "There's going to be some problems."

**D. YK Testifies and Then Flees the Country While Under Subpoena**

On September 19, 2013, YK appeared before the grand jury. At the conclusion of her testimony, she was served with a subpoena to appear for additional testimony at a later date. YK never appeared, however, because on September 25, 2013, while under subpoena, she fled the country. Later, OIG agents executed a search warrant on Defendant's cell phone, and discovered that he remained in frequent contact with YK up to and after she left the country. His text messages showed that in February 2014, Defendant sent $1,000 to YK in Korea, following her instructions to send the money by Western Union so there would be "no trace." Defendant did not use his true legal name on the money transfer forms, instead identifying the sender as "Tim Jo."

**ANALYSIS**

**A. The Alleged False Statements Were Material to a Federal Investigation**

Count 1 charges Defendant Joel with obstruction of justice in violation of 18 U.S.C. § 1503.  The obstruction allegedly occurred from a date unknown through September 25, 2013 by Joel making false statements to HSI agents, warning YK that federal agents were planning to serve her with a grand jury subpoena, inducing YK to leave the United States to avoid service of the grand jury subpoena, and providing YK financial support following her departure from the United States.

Count 4 charges Joel with false statements in violation of 18 U.S.C. §1001. The crime is alleged to have occurred on or about September 5, 2013 when Joel falsely claimed that (1) he did not have an address for YK; (2) only had an old phone number for YK and (3) had last had contact with YK the previous week.

Joel argues that under both 18 U.S.C. §§ 1513 and 1001, the alleged false statements must be material.  Joel claims that none of his statements were material because the federal agent's questions were made for the purpose of inducing Joel to make a false statement.  Joel asserts that the questions posed by the federal agents were not for an investigative purpose, but rather to see if he would tell the truth.

In addition, with respect to the § 1001 count, Joel argues that his alleged false statements did not relate to any ongoing investigation by " Security and were thus outside the jurisdiction of HSI.

**(1) 18 U.S.C. § 1503**

Title 18 U.S.C. § 1503(a) provides, in pertinent part: "Whoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b)." Known as the omnibus clause, this language "was designed to proscribe all manner of corrupt methods of obstructing justice." *United States v. Rasheed*, 663 F.2d 843, 852 (9th Cir. 1981). The Ninth Circuit has held that the text of the omnibus clause, in concert with its definition of

"corruptly", encompasses any act that a jury might infer was intended to "influence, obstruct, or impede . . . the due administration of justice." That is the case even if no actual obstruction occurs, because the clause's use of "endeavors" makes "success . . . irrelevant." *See United States v. Richardson*, 676 F.3d 491, 503 (5th Cir.2012) (internal quotation marks omitted).

A § 1503 conviction requires a showing that the defendant acted "with an intent to influence judicial or grand jury proceedings." *United States v. Aguilar*, 515 U.S. 593, 599 (1995) (*citing United States v. Brown*, 688 F.2d 596, 598 (9th Cir. 1982)). The prosecution makes this showing when it establishes a "nexus" between the defendant's act and the judicial proceeding in "time, causation, or logic." *Id*. (*citing United States v. Wood, 6 F.3d 692, 696* (10th Cir. 1993); *United States v. Walasek*, 527 F.2d 676, 679, and n. 12 (3d Cir. 1975). Existence of this nexus demonstrates that the defendant knew his action would have "the natural and probable effect of interfering with the due administration of justice." *Id*. (*quotin*g *Wood*, 6 F.3d at 695; *United States v. Thomas*, 916 F.2d 647, 651 (11th Cir. 1990); *accord*, *United States v. Bonds*, 784 F.3d 582, 589 (9th Cir. 2015).

Defendant Joel argues that his statements were not material and were not capable of interfering with the due administration of justice. (ECF No. 25-1 at 11.) Defendant asserts that statements cannot be material when made to an agent whose sole purpose for asking the question is to induce a false statement and not to ascertain information upon which to base a decision or activity. *Id*. However, the Ninth Circuit has held that the materiality requirement can be satisfied when government employees already knows the answers to the questions that produce false responses from the defendant. In *United States v. Goldfine,* the Ninth Circuit stated:

> [W]e believe that the conduct Congress intended to prevent by § 1001 was the willful submission to federal agencies of false statements calculated to induce agency reliance or action, irrespective of whether actual favorable agency action was, for other reasons, impossible. We think the test is the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end as measured by collateral circumstances.

1
2
3
4
5
6
7
8
9
10

*United States v. Goldfine*, 538 F.2d 815, 820-21 (9th Cir. 1976) (*quoting United States v. Quirk*, 167 F.Supp. 462, 464 (E.D. Pa. 1958), *aff'd* 266 F.2d 26 (3d Cir. 1959)). *Accord United States v. Pereira*, 463 F. Supp. 481, 486-87 (E.D.N.Y. 1978) (dictum). In *Goldfine,* compliance investigators of the Drug Enforcement Administration already knew the defendant, who was a pharmacist, had made out-of-state purchases. *Id.* The Ninth Circuit held that the registered pharmacist's statement to the effect that he had not made out-of-state purchases when he had in fact made such purchases was material to the investigation even though the investigators already knew that the pharmacist had made such purchases. *Id*.

11
12
13
14

In this case, even if the agents already knew YK's whereabouts—which appears to be in dispute—and knew her phone number and address, the alleged false statements would still be material where they were intrinsically false and were calculated to impede the administration of justice.

15
16
17
18
19
20
21
22

In addition, assuming that Joel's alleged false statements were not material, Count 4 relies on more than Joel's statements as the means of impeding the grand jury. The government also alleges that Joel warned YK that federal agents were planning to serve her with a grand jury subpoena and thereafter induced her to leave the United States in order to prevent her from testifying before the grand jury, and then provided financial support for YK to leave the United States. Joel does not dispute that these additional actions had the "natural and probable effect" of interfering with the grand jury.

23

**(2) 18 U.S.C. § 1001**

24
25
26
27
28

To make a false statement "willfully" under § 1001, the defendant must have the specific intent to make a false statement. Specific intent does not require evil intent but only that the defendant act deliberately and with knowledge. *United States v. Heuer*, 4 F.3d 723, 732 (9th Cir. 1993). Actual reliance is not required. *United States v. Talkington*, 589 F.2d 415, 417 (9th Cir. 1978). "The false statement need not have

actually influenced the agency, and the agency need not rely on the information in fact for it to be material." *United States v. Serv. Deli Inc*., 151 F.3d 938, 941 (9th Cir. 1998); *see also United States v. Matsumaru*, 244 F.3d 1092, 1101 (9th Cir. 2001).

As noted in the foregoing section, a statement can still be material to the investigation even where the investigators already know the answers and are not deceived by the defendant. *See Goldfine*, 538 F.2d at 20-21. Thus, the fact that the federal agents already knew the address, phone number and whereabouts of YK would not affect the materiality of false statements regarding these matters. *United States v. Yermian*, 468 U.S. 63, 73 & n.13 (1984) (no requirement that the defendant acted with the intention of influencing the government agency).

In addition, Defendant Joel questions whether his alleged false statements were made as to matters within the jurisdiction of a department or agency of the United States. The initial determination whether the matter is one within the jurisdiction of a department or agency of the United States—apart from the issue of materiality—should be made by the court as a matter of law. *United States v. F.J. Vollmer & Co., Inc*., 1 F.3d 1511, 1518 (7th Cir. 1993). Because there is a valid legislative interest in protecting integrity of official inquiries, term "jurisdiction", in this section proscribing making of fraudulent statements as to matter within jurisdiction of any department or agency of United States, should not be given narrow or technical meaning. *Bryson v. United States*, 396 U.S. 64 (1969).  No mental state is required with respect to the fact that a matter is within the jurisdiction of a federal agency, and the false statement need not be made directly to the government agency. *United States v. Green*, 745 F.2d 1205, 1208-10 (9th Cir. 1984).

Joel asserts that the primary mission of HSI is to investigate cross-border crimes, including human trafficking, whereas the call was made for the Department of Justice OIG investigation and not HSI. (ECF No. 25-1 at 14-15.) Joel continues that HSI had no jurisdiction over the subject matter of the conversation and was not investigating YK's immigration status. While recognizing that multi-agency investigations are

1   perfectly legitimate, Joel concludes that this is not one.

2       The Court rejects this narrow interpretation of § 1001 because there is no
3   requirement that a false statement be made to a particular federal agency; it must only
4   have been made in "any matter within the jurisdiction of any department or agency of
5   the United States." 18 U.S.C. § 1001; *see United States v. Candella*, 487 F.2d 1223,
6   1227 (2d Cir. 1973) ("[A] violation of § 1001 does not require that the false statement
7   must actually have been submitted to a department or agency of the United States, but
8   rather that it was contemplated that the statement was to be utilized in a matter which
9   was within the jurisdiction of such department or agency."), *cert. denied*, 415 U.S. 977
10  (1974). In this case, the false statements were made to HSI and related to a matter
11  within the jurisdiction of OIG.

12      In addition, a federal department or agency has jurisdiction within the meaning
13  of 18 U.S.C. § 1001 "when it has the power to exercise authority in a particular
14  situation," as distinguished from "matters peripheral to the business of that body."
15  *United States v. Rodgers*, 466 U.S. 475, 479 (1984). In the present case, the HSI agents
16  were working with OIG on a matter that originated as a cross-border human trafficking
17  case and involved the alleged misuse of immigration documents to permit YK to
18  remain in the United States to assist in a human trafficking investigation.  The Court
19  concludes that HSI's role in this investigation relates to its stated mission and is not
20  peripheral to the business of HSI.

21      Lastly, there is an alternative basis to find that the element of jurisdiction is
22  present.  There is no dispute that OIG has jurisdiction over the investigation of
23  Defendant Joel. The facts show that OIG has worked together with HSI to conduct the
24  investigation of Joel.  Even if HSI did not itself have jurisdiction over Joel's
25  investigation, OIG's role as a supervisory agency would create jurisdiction under
26  § 1001. *See United States v. Petullo*, 709 F.2d 1178, 1180 (7th Cir. 1983) (the mere
27  existence of a federal agency's supervisory authority is important to determining
28  jurisdiction).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendant Joel's Motion to Dismiss Counts 1 and 4 of the Indictment.

DATED:  August 20, 2015

HON. GONZALO P. CURIEL
United States District Judge