UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>TIMOTHY JOEL,<br><br>    Defendant. | CASE NO. 15-cr-0430-GPC<br><br>**ORDER DENYING DEFENDANT"S MOTION IN LIMINE TO SUPPRESS SEPT. 5, 2013 CALL**<br><br>[ECF No. 37] |

**INTRODUCTION**

Defendant Timothy Joel ("Joel" or "Defendant") is charged in a four-count indictment with obstruction of justice, witness tampering, and false statement. On July 21, 2015, Joel filed a motion in limine seeking to suppress evidence of a September 5, 2013 recorded call between Joel and a Homeland Security Investigations ("HSI") special agent. The Government filed its response on September 2, 2015. Joel filed a reply on September 16, 2015 and supplemental documents in support of its motion on September 20, 2015. On September 28, 2015, the Court held a hearing on the motion. Based on the papers filed and arguments of counsel, the Court DENIES the motion to suppress the September 5, 2013 recorded call.

///

///

**INDICTMENT**

On February 19, 2015, the grand jury returned an Indictment charging Defendant with four felony counts: obstruction of justice, in violation of 18 U.S.C. § 1503 (Count 1); witness tampering, in violation of 18 U.S.C. § 1512(b)(2)(C) (Count 2); witness tampering, in violation of 18 U.S.C. § 1512(b)(2)(D) (Count 3); and making a false statement to a federal officer, in violation of 18 U.S.C. § 1001 (Count 4). Defendant Joel entered not guilty to all counts on February 26, 2015. On September 18, 2015, the Court granted the Government's motion to dismiss Count 3 of the Indictment.

**FACTUAL BACKGROUND**

According to Government allegations, in 2007, Joel was a Special Agent assigned to an FBI squad in San Diego that investigated alien smuggling. In May 2007, Joel interviewed a Korean national (herein referred to by her initials "YK"), after she was apprehended at the Port of Entry attempting to enter the United States with false entry documents. Joel learned that YK was attempting to illegally enter the United States. Defendant thereafter applied for "Significant Public Benefit Parole" for YK, a form of immigration status, claiming that she was a material witness in a criminal investigation. Defendant renewed YK's parole status in 2008, despite the fact that she was not actively working with the FBI. YK's parole status eventually expired in early 2009, and thereafter she had no legal right to remain in the United States. The Government alleges that Joel did not effect YK's departure from the United States, but instead began making dozens of payments to her through bank transfers, totaling over $20,000. Beginning in 2012, Defendant moved in with YK, living with her in an apartment in Los Angeles.

**A. FBI OPR Investigation**

In July 2012, the FBI received information from a confidential source that Defendant was living with a suspected illegal alien, who worked as a "hostess" at a karaoke bar. The Office of Professional Responsibility ("OPR") of the FBI opened an investigation, and flew Defendant to Washington, DC for an interview. At the

conclusion of the interview, the FBI referred the matter to the Department of Justice Office of Inspector General ("DOJ OIG") for a criminal investigation.

### B. DOJ OIG Criminal Investigation of Joel for Alien Harboring

On or about January 16, 2013, OIG agents Anthony Costakis and Thomas Reynolds interviewed Defendant Joel in Glendale, California. At the interview, Joel supplied agents with a letter which described his earlier OPR interview. In the letter, Joel reiterated that (1) he paroled YK into the United States as a witness in 2007 when he was working in San Diego, (2) he recently reconnected with YK when he was searching for an apartment in Los Angeles, (3) he did not have any association with YK after he moved to Washington in 2009, and (4) he only lived with YK briefly, for a few months in 2012.

The Government alleges that following their interview of Joel, OIG agents investigated Defendant's claims, and discovered that many of them were false. First, Defendant's bank records showed that he made regular cash transfers to YK from 2009 through 2013, totaling more than $20,000. Second, Defendant's phone records showed frequent telephone contact with YK over the past five years, including the entire year that Joel was in Washington, D.C. Finally, agents obtained the original parole documents for YK, submitted by Joel in 2007 and 2008. In those documents, Defendant described YK as a "leading material witness" in an alien smuggling investigation, when in fact FBI records do not contain any evidence that YK was opened as a source or provided any substantive information.

### C. OIG Attempts to Serve YK with a Subpoena

Throughout 2013, OIG agents continued to investigate Defendant relating to his relationship with YK. The investigating agents learned both YK and Defendant rented separate apartments, on the same floor of a new apartment building, at 349 South Lafayette Park, in Los Angeles. Later, an interview with the manager from that apartment revealed that YK had broken her lease and moved out. Shortly thereafter, Defendant Joel broke his lease and moved out as well.

On September 5, 2013, OIG arranged for HSI Special Agent Jacobsen to place an undercover recorded call to Defendant. On the morning of the recorded call, agents in Los Angeles established surveillance near the Defendant's apartment building. The call was placed after Joel left his apartment.

In the recorded call, HSI SA Jacobsen told Joel that she was trying to determine YK's status and serve her with a grand jury subpoena. Joel then asked SA Jacobsen if this was "regarding OIG stuff?" SA Jacobsen replied that "I don't know what it's about. It's just a Grand Jury subpoena that I need to serve on her. It's a Homeland Security Investigations matter." Joel notified SA Jacobsen that he had contacted an FLEOA (Federal Law Enforcement Officers Association) attorney and didn't know whether OIG was doing anything.[1] At the conclusion of the call, the agent warned Defendant not to contact YK and discuss the grand jury subpoena.

After the call ended, agents observed Joel return to his apartment building, at 11:12 a.m. He stayed for approximately one hour, and then returned to his FBI office downtown. A few hours later, agents observed YK exiting Defendant's building and entering the parking garage. Agents then served YK with a grand jury subpoena. Afterwards, YK sent a text message to Defendant, stating "I received the paper. I got caught. At the parking lot." Defendant later responded, "There's going to be some problems."

**D. YK Testifies and Then Flees the Country While Under Subpoena**

On September 19, 2013, YK appeared before the grand jury. At the conclusion of her testimony, she was served with a subpoena to appear for additional testimony at a later date. YK never appeared, however, because on September 25, 2013, while under subpoena, she fled the country. Later, OIG agents executed a search warrant on

---

[1] The attorney referenced in the call was Larry Berger. At the hearing on the motion, defense counsel reported that Berger was retained through the FLEOA following the January 2013 interview of Joel to represent him in administrative proceedings relating to Joel's security clearance. Reportedly, the proceedings were a result of Joel's relationship with YK and his statements to investigators. Berger is not a criminal defense attorney.

Defendant's cell phone, and discovered that he remained in frequent contact with YK up to and after she left the country.

## ANALYSIS

Count 4 charges Joel with false statements in violation of 18 U.S.C. § 1001. The crime is alleged to have occurred on or about September 5, 2013 when Joel falsely claimed that (1) he did not have an address for YK; (2) only had an old phone number for YK and (3) had last had contact with YK the previous week. Defendant Joel moves to suppress the September 5, 2013 phone call because Joel was a grand jury target and the Government was aware that he was represented by counsel with respect to the OIG investigation. The crux of Defendant's argument is that the Government violated California Rule of Professional Conduct 2-100 ("Rule 2-100") and that the proper remedy for this violation is suppression. The Government responds that the United States did not violate any ethical rules and, even if it did violate Rule 2-100, suppression is not warranted.

**A. Rule 2-100**

Joel's motion raises three issues: (1) does Rule 2-100 apply to the pre-indictment contact of Joel by the Government; (2) was the contact made by the Government "authorized by law"; (3) if the contact was prohibited, does Rule 2-100 or federal law require suppression of evidence for the unauthorized contact.

**1. Whether Rule 2-100 Applies**

Rule 2-100 governs communications by lawyers with represented parties. It provides that "[w]hile representing a client, a member [of the State Bar of California] shall not communicate directly or indirectly about the subject matter of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer." Cal. R. Prof. Conduct § 2-100. The rule exists in order to "'preserv[e] . . . the attorney-client relationship and the proper functioning of the administration of justice.'" *United States v. Talao*, 222 F.3d 1133, 1139 (9th Cir. 2000) (internal citations and quotations

omitted). Under 28 U.S.C. § 530B, known as the McDade Amendment, Rule 2-100 applies to government prosecutors. The McDade Amendment provides that "[a]n attorney for the government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a); *see also id.* at 1139-40 (providing historical background on ethical rules for government attorneys). State laws governing attorneys have been extended to government investigators as well. *United States v. Jamil*, 707 F.2d 638, 645 (2d Cir. 1983) (citations omitted) ([state laws governing attorneys] may be found to apply in criminal cases, to government attorneys and to non-attorney government law enforcement officers when they act as the alter ego of government prosecutors.)

As a threshold matter, the Court must determine whether Rule 2-100 applies in a pre-indictment, non-custodial scenario. In *United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988), the Second Circuit rejected the argument that an ethical rule analogous to Rule 2-100 was "coextensive with the sixth amendment" and therefore remained "inoperative until the onset of adversarial proceedings," i.e., indictment. *Id*. at 839. Observing that the timing of indictment "lies substantially within the control of the prosecutor," the court explained that under an ethical rule that was dependent on indictment, "a government attorney could manipulate grand jury proceedings to avoid its encumbrances." *Id.*

The Ninth Circuit has approvingly cited *Hammad* and rejected a bright line rule, instead opting for a "case-by-case adjudication approach" to determine whether "pre-indictment, non-custodial communications by federal prosecutors and investigators with represented parties" violate Rule 2-100. *Talao* at 1138-39. In *Talao*, the court recognized the possibility that pre-indictment conversations could violate the rule and "declined to announce a categorical rule excusing all such communications from ethical inquiry." *Id*.

To determine whether Rule 2-100 applied, the *Talao* court focused on whether

the circumstances showed that the parties had developed "fully defined adversarial roles." *Id*. at 1139. The Government argues that the parties had not reached "fully defined adversarial roles" at the time of the contact with Joel. The Government points out that, in *Talao*, at the time of the contact with a represented employee, the target corporations's attorney had initiated negotiations with the government to resolve the case. Meanwhile, there were no similar communications in this case. In addition, the Government relies on the fact that Joel did not have criminal defense counsel at the time of the contact.

Relying on *Talao*, Defendant argues that Rule 2-100 applies in the instant case because at the time of the September 5, 2013 call Joel had been a Grand Jury target "for quite some time, possibly [since] January 2013" and it is undisputed that at that point the Government knew Joel was represented by counsel. (MIL at 27, ECF No. 37.)

The factors that weigh in favor of Defendant's view are: (1) as of September 5, 2013, the Government had conducted an ongoing criminal investigation of Joel for approximately 8 months which included two interviews of Joel by criminal investigators; (2) the investigation had developed into a grand jury investigation of Joel that was being managed by an Assistant United States Attorney; (3) the FBI had initiated separate administrative proceeding involving Joel's security clearance; (4) both the grand jury proceedings and the administrative proceedings related to Joel's relationship with YK; and (5) Joel had retained counsel for the administrative proceedings as of September 5, 2013.

Factors which favor the Government consist of: (1) there had been no communications between OIG and Defendant's counsel regarding the criminal investigation; (2) as of September 5, 2013, Defendant did not have a criminal defense attorney; and (3) there were no discussions with the United States regarding a potential pre-indictment plea agreement.

A number of factors support each side's position whether the parties had established "fully adversarial positions" with each other at the time of the recorded call.

However, weighing the competing facts, the Court finds that as of September 5, 2013 the roles of the parties were sufficiently adversarial so as to require a review of the contact under Rule 2-100.

### 2. Whether Contact Was Otherwise Authorized by Law

Here, the Government originally claimed that the purpose of the contact with Joel was to learn the whereabouts of YK. At the hearing, the Government acknowledged that the recorded call had a dual purpose, that is, to locate YK and to test Joel's trustworthiness and credibility. Joel challenges the assertion that the Government was trying to locate YK where the Government could have easily contacted YK through her retained attorney or at the cell phone number YK had provided to the Government. The Court finds that the primary purpose of the contact was for an investigative purpose.

The Government argues that the recorded call did not violate Rule 2-100 because it was "authorized by law." Rule 2-100 does not forbid communications with a represented defendant that are "otherwise authorized by law." Rule 2-100(C)(3). A prosecutor is "authorized by law" to employ legitimate investigative techniques in conducting or supervising criminal investigations. Communications that are "otherwise authorized by law" include communications made under "the authority of government prosecutors and investigators to conduct criminal investigations, as limited by the relevant decisional law." Rule 2-100.

As relevant decisional law, the Government relies on Ninth Circuit cases that have held that pre-indictment, non-custodial communications by federal prosecutors and investigators with represented parties do not constitute a violation of the no contact rule. *United States v. Carona*, 660 F.3d 360, 365 (9th Cir. 2011) (citing *United States v. Powe*, 9 F.3d 68, 69 (9th Cir.1993) (per curiam) (finding no violation of Rule 2–100 where a codefendant "agreed to become a cooperating witness for the prosecution," "met with [the represented defendant] before [he] was charged or arrested," and "secretly recorded that conversation"); *United States v. Kenny*, 645 F.2d 1323, 1339

(9th Cir. 1981) ("In our view, the Government's use of such investigative techniques [non-custodial environment, prior to defendant's charge, undercover] does not implicate the sorts of ethical problems addressed by the Code."); *accord Haddad*, 858 F.2d at 839 (use of informants by prosecutors in a pre-indictment, non-custodial situation, generally falls within the "authorized by law" exception to the applicable state law governing attorneys and therefore will not be subject to sanctions).

Joel acknowledges that the September 5, 2013 ruse call qualifies as an undercover investigative tool but disputes that Ninth Circuit cases involving undercover investigations apply to the instant case.

At the time of the recorded call, Joel was not in custody, and was not questioned regarding past conduct that was the subject of the grand jury investigation or the administrative proceedings. Joel had not yet retained criminal defense lawyer. The undercover ruse call is a common tool in undercover operations and was employed in this case on September 5, 2013. The Court finds that the undercover contact did not threaten the attorney-client relationship or the proper functioning of the administration of justice. For the above reasons, the Court concludes that the September 5, 2013 contact was "otherwise authorized by law."

### 3. Suppression as a Remedy

Assuming that SA Jacobsen's contact of Joel was not "authorized by law," the Court must determine whether suppression of the telephone call or dismissal of the indictment is appropriate. The Government argues that even if government counsel violated Rule 2-100, suppression of the call is not an appropriate remedy.

In the Ninth Circuit, a district court may exercise its supervisory powers to exclude evidence obtained through a violation of Rule 2-100. *Powe*, 9 F.3d at 69; *Lopez*, 4 F.3d at 1463. "There are three legitimate grounds for a court's exercise of supervisory power: 'to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal

conduct.'" *Lopez*, 4 F.3d at 1463 (quoting *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991)); *United States v. Hasting*, 461 U.S. 499 (1983).  However, the exclusionary rule is an extreme remedy "restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338 (1974). This is because "suppression of probative but tainted evidence exacts a costly toll upon the ability of courts to ascertain the truth in a criminal case." *United States v. Payner*, 447 U.S. 727, 734 (1980) (citations omitted).  The Supreme Court has limited the application of the exclusionary rule as a remedy to constitutional violations and "willful disobedience of law." *See McNabb*, 318 U.S. 332, 345 (1943).

Assuming that Rule 2-100 was violated, suppression is unwarranted. Defendant does not cite any Ninth Circuit case suppressing evidence for a violation of Rule 2-100.[2] There is no clear precedent that holds contact of Joel was prohibited under Rule 2-100.[3] As such, the Court is unable to find that any Rule 2-100 violation was made in "willful disobedience of law." Given the lack of a willful violation of the law, the Court concludes that suppression of the call would exact a costly toll under the circumstances. Allowing Defendant to immunize himself from the OIG investigation simply by retaining counsel in administrative proceedings involving his security clearance "would be antithetical to the administration of justice." *Carona*, 660 F.3d at 366.

///
///
///
///

---

[2] Instead, Joel relies on *United States v. Koerber*, 966 F. Supp. 2d 1207 (D.Utah 2013) as support for his argument. *Koerber* was decided outside of the Ninth Circuit and is not binding on this Court.

[3] In his supplemental briefing, Joel also relies on "Guidelines on Undercover Operations" as further support for his argument. Joel asserts that the undercover guidelines apply in this case due to the use of an undercover tool by the agents. Joel has not provided any authority to support suppression of evidence based upon an alleged breach of internal guidelines.

**CONCLUSION**

For the foregoing reasons, the Court DENIES Defendant Joel's Motion to Suppress the September 5, 2013 recorded call.

DATED: September 29, 2015

HON. GONZALO P. CURIEL
United States District Judge